## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

AARON COLLINS,

              Plaintiff,

  v.

SOUTHERN NEW ENGLAND
TELEPHONE COMPANY,

              Defendant.

3:08-cv-00595 (CSH)

### MEMORANDUM OF DECISION
### AND ORDER

HAIGHT, Senior District Judge:

In this action asserting claims under federal and state civil rights statutes and the common law, defendant moves to dismiss all but the federal claim on the ground that the others are preempted by the Employee Retirement Security Act ("ERISA"), 29 U.S.C. § 1001, *et seq*.

## I.    Introduction

Around the end of November, 2005, the Southern New England Telephone Company ("SNET") merged with AT&T,[1] which at the time employed plaintiff Aaron Collins ("Collins"). Collins was one of many employees affected by the change in corporate ownership.

The following is a brief summary of Collins's allegations:  Collins claims he was treated differently than his coworkers during this change in ownership.  Specifically, other coworkers were sent letters that "offered the option to resign with severance based on years of service." Second Am. Compl. [doc. #16] ¶ 15 [hereinafter "Complaint"].  Collins was not given this option, and was

---

[1]    In his original complaint and its amended versions, Collins refers to the defendant in this case as "Southern New England Telephone Company, d/b/a AT&T Services, Inc."  However, the defendant's papers have referred to the defendant almost exclusively as the Southern New England Telephone Company ("SNET") and made no mention of whether or not it does business as "AT&T Services, Inc."  Therefore, throughout this opinion, I will refer the defendant as SNET, bearing in mind that later revelations might render that designation somewhat incomplete.

instead assigned to the position of "IT Project Manager," even though he was not qualified for that position. Collins resisted the assignment and "requested the offered severance." *Id.* ¶ 19. That request was denied, but SNET instead promised to offer him extensive training for the new position, which never materialized. Collins was assigned to projects he was not capable of completing, and "ultimately set-up to fail." *Id.* ¶ 25. This caused him to suffer anxiety, depression, and ultimately unspecified illness, for which he "was admitted into the hospital" and "medically removed from the workplace." *Id.* ¶¶ 28-29. Around that time, SNET terminated Collins's employment. *Id.* ¶ 29. The story ends there, in January, 2006 — only two months after SNET took over AT&T.

Collins asserts six counts. The first two counts are for racial discrimination, under Title VII and the corresponding Connecticut statute, and the next four common law counts are for intentional infliction of emotional distress, breach of contract, breach of the implied duty of good faith and fair dealing, and promissory estoppel.

On this motion to dismiss, SNET raises only one argument: that all of Collins's claims, save Count One under Title VII, are preempted by the Employee Retirement Income Security Act of 1974 ("ERISA").

## II.     Legal Standards

### A.      Standard on Motion To Dismiss

A motion to dismiss under Rule 12(b)(6) must be decided on "facts stated on the face of the complaint, in documents appended to the complaint or incorporated in the complaint by reference, and [] matters of which judicial notice may be taken." *Leonard F. v. Israel Disc. Bank of N.Y.,* 199 F.3d 99, 107 (2d Cir. 1999) (citation omitted); *see also Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("In addition, even if not attached or incorporated by reference, a document upon which the

complaint *solely* relies and which is *integral to the complaint* may be considered by the court in ruling on such a motion." (brackets, citation, and internal quotation marks omitted; emphasis in *Roth*)).[2]  In deciding a motion to dismiss, well-pleaded facts must be accepted as true and considered in the light most favorable to the Plaintiff.  *Patane v. Clark,* 508 F.3d 106, 111 (2d Cir. 2007).  The issue in deciding a motion to dismiss is "not whether the plaintiff will ultimately prevail but whether the plaintiff is entitled to offer evidence to support the claims."  *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995).  The factual allegations made in the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true."  *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  This requires the complaint to contain "enough fact to raise a reasonable expectation that discovery will reveal evidence" of the plaintiff's claim.  *Id.* at 556.

Although SNET points to the factual standard of review on a motion to dismiss recently refined by *Twombly*, its only actual argument concerns the *legal* sufficiency of plaintiff's claims, as opposed to their plausibility from a factual perspective.  Specifically, SNET argues that plaintiff's claims in Counts Two through Six are all preempted by federal law.  I turn now to that issue.

## B.    ERISA Preemption

With certain exceptions not relevant here, Section 514 of ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan."  ERISA § 514(a),

---

[2]      Because the Complaint in no way relies on the ERISA plan *qua* plan — as I describe in detail later — I do not refer to any of its provisions in this opinion.  Nevertheless, SNET has attached the plan to its motion papers.  To the extent it is necessary to resolve this motion on the merits, I take it for granted that the plan exists, and I assume for the purposes of argument that Collins would have been entitled to some amount under the plan if he had been given the option to resign with severance.

codified at 29 U.S.C. § 1144(a).  The statute also defines "State laws" in such a way as to embrace common law claims and other judicially created law.[3]

The Supreme Court has dealt with the scope of this preemption in more than twenty cases since the law was passed in 1974, describing the provision as generating "an avalanche of litigation in the lower courts." *De Buono v. NYSA-ILA Medical and Clinical Servs. Fund*, 520 U.S. 806, 809 n.1 (1997).

In earlier cases, the Supreme Court repeatedly noted that ERISA preemption was "deliberately expansive, and designed to establish pension plan regulation as exclusively a federal concern." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46 (1987); *see also, e.g.*, *FMC Corp. v. Holliday*, 498 U.S. 52, 58 (1990) ("The pre-emption clause is conspicuous for its breadth.").  The breadth of this preemption was grounded in the statute's unqualified phrase "insofar as they . . . *relate to* any employee benefit plan." (emphasis added).

However, the concept of ERISA preemption underwent a material alteration when the Supreme Court decided *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995).  In *Travelers*, the question presented was whether ERISA preempted a state statute's provisions requiring hospitals to collect surcharges from patients whose commercial insurance coverage was purchased by employee health-care plans governed by ERISA, and subjecting certain health maintenance organizations (HMOs) to surcharges insofar as their

---

[3]     *See, e.g.*, *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 138-39 (1990) ("Moreover, to underscore its intent that § 514(a) be expansively applied, Congress used equally broad language in defining the 'State law' that would be pre-empted.  Such laws include 'all laws, decisions, rules, regulations, or other State action having the effect of law.'" (quoting ERISA § 514(c)(1), 29 U.S.C. § 1144(c)(1))).  *Ingersoll-Rand* found a common law claim to be preempted; however, it was decided before the watershed opinion in *Travelers*.  It is discussed in greater detail *infra* at Section II.B.3. of this opinion.

membership fees were paid by an ERISA plan.  In a unanimous opinion, the Court held "that the provisions for surcharges do not 'relate to' employee benefit plans within the meaning of ERISA's pre-emption provision, § 514(a), 29 U.S.C. § 1144(a), and accordingly suffer no pre-emption." *Id*. at 649.  The *Travelers* Court steered a course away from the "clearly expansive" text of ERISA's § 514(a), reasoning that "if 'relate to' were taken to extend to the furthest reach of its indeterminancy, then for all practical purposes pre-emption would never run its course, for really, universally, relations stop nowhere." *Id*. at 655 (citation and internal quotation marks omitted.).[4] In *Travelers*, the Court rejected that limitless concept of relationship, noted its earlier decisions declaring "the starting presumption that Congress does not intend to supplant state law," *id*. at 654 (citations omitted), and said of the phrase "relate to" as used in ERISA: "We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Id*. at 656.  Applying that test, the state statute in *Travelers* survived preemption.

The Second Circuit has described the Supreme Court's opinion in *Travelers* as having "greatly narrowed" the scope of preemption. *Hattem v. Schwarzenegger*, 449 F.3d 423, 428 (2d Cir. 2006); *id.* at 430; *see also id.* at 431 (noting that since *Travelers* "there has been a significant change in preemption analysis that necessitates revamping our once-broad view of its scope." (citing *Gerosa v. Savasta & Co.,* 329 F.3d 317, 327 (2d Cir. 2003) (joining "several of our sister circuits" in noting that "*Travelers* occasioned a significant change in preemption analysis, and required careful

---

[4]     In similar vein, Justice Scalia has remarked that "applying the 'relate to' provision according to its terms was a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else."  *Cal. Div'n of Labor Stds. Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring).

consideration of any preexisting precedent dependent on the expansive view of 'related to' that held sway before it")))).[5]

Since *Travelers*, those arguing for preemption must also overcome a "heavy burden" of a presumption that Congress does not usually intend to preempt "the historic police powers of the States." *Hattem*, 449 F.3d at 428. The Second Circuit claims to have "anticipated *Travelers*" in 1989, when it upheld Connecticut's escheat statute, "noting that we would not supersede 'the historic police powers of the States . . . unless that was the clear and manifest purpose of Congress.'" *Gerosa v. Savasta*, 329 F.3d at 327 (quoting *Aetna Life*, 859 F.2d at 144-45); *see also Travelers,* 514 U.S. at 655 (applying this principle whenever "federal law is said to bar state action in fields of traditional state regulation" (citing *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947))). *See also Cal. Div'n of Labor Stds. Enforcement v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (1997); *De Buono*, 520 U.S. at 814 n.8 (1997).

But it cannot be said that in *Travelers,* the Court entirely abandoned its earlier holdings on preemption. Tensions remained between *Travelers* and those prior cases. Two years later, the Court found it necessary to explain how its prior holdings were consistent with *Travelers*. The Court remarked that its decisions before *Travelers* had concerned state laws with a "*clear* 'connection with or reference to' ERISA benefit plans," whereas (presumably) *Travelers* and subsequent cases were not as clear. *De Buono*, 520 U.S. at 813 (emphasis added) (quoting *Shaw v. Delta Air Lines*, 463 U.S. 85, 96-97 (1983)).

---

[5]     Commentators appear to agree with this characterization. *See, e.g.*, Jayne E. Zanglein & Susan J. Stabile, *ERISA Litigation* 144 (3d ed. 2008) ("It is fair to say that in the wake of *Travelers* and its progeny, lower courts have generally taken a more restrictive approach to preemption.").

*De Buono* is significant because it signals a further retreat from the Court's previous view that ERISA preemption was "deliberately expansive." *DeBuono* effectively demoted such statements to *obiter dicta* when it observed that in the earlier cases "it had not been necessary to rely on the expansive character of ERISA's literal language in order to find pre-emption." 520 U.S. at 813. The *De Buono* Court continued:

> But in *Travelers* we confronted directly the question whether ERISA's "relates to" language was intended to modify the starting presumption that Congress does not intend to supplant state law. We unequivocally concluded that it did not, and we acknowledged that our prior attempts to construe the phrase "relate to" do not give us much help drawing the line here.

*Id.* (internal quotation marks, brackets, citations, and footnote omitted).

Whatever tensions may remain between *Travelers* and the Court's earlier decisions on ERISA preemption, *Travelers* clearly commands the lower federal courts to look to ERISA's objectives as a guide. In looking to the objectives that motivated ERISA and its preemption clause, I am instructed by the Second Circuit's recent instruction in *Hattem* concerning those objectives:

> Congress intended ERISA to establish the regulation of employee-benefit plans as an exclusively federal concern. Specifically, Congress aimed "to ensure that plans and plan sponsors would be subject to a uniform body of benefits law." This minimizes the administrative and financial burdens of complying with conflicting directives from the states, and between the states and the federal government. This was designed to prevent a conflict of substantive law that would require tailoring "plans and employer conduct to the peculiarities of the laws of each jurisdiction." In sum, the "basic thrust of the pre-emption clause, then, was to avoid multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans," and to prevent frustrating plan administrators' obligations to calculate uniform benefit levels nationwide.

*Hattem*, 449 F.3d at 429 (citing and quoting *Travelers*; internal citations omitted).

In *Hattem*, the Second Circuit also stressed the importance of an alternative test for preemption, reiterated by the Supreme Court in *Travelers*, that "a law *relates to* an employee benefit plan, within the meaning of [the preemption clause], if it has a '*connection with*' or '*reference to*' such a plan." *Hattem*, 449 at 428 (emphases added; quoting *Travelers*, 514 U.S. at 656). This two-pronged test for preemption finds its genesis in *Shaw*, which the Court decided in 1983. The innovation suggested by *Travelers* was to rely more heavily on "the objectives of the ERISA statute" when assessing whether a state law violates either of those prongs.

### 1.    The "Connection With" Prong

Although the Supreme Court has reaffirmed its two-prong test from *Shaw*, it has also recognized that the "connection with" standard "offer[s] scant utility in determining Congress' intent as to the extent" of the preemption clause. *Dillingham*, 519 U.S. at 325.[6]  For precisely that reason, the decision in *Travelers* emphasized congressional intent in assessing whether state laws should be preempted under this prong, and this emphasis has been the focus of preemption analyses since then:

> [T]o determine whether a state law has the forbidden connection, we look both to "the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive," as well as to the nature of the effect of the state law on ERISA plans.
>
> As is always the case in our pre-emption jurisprudence, where "federal law is said to bar state action in fields of traditional state regulation, . . . we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'"

*Dillingham*, 519 U.S. at 325 (quoting *Travelers*; further citations omitted; emphases added).

---

[6]    Perhaps that is because "connections with" things are about as tenuous a concept as "relations to" things, or to paraphrase Justice Scalia's curbstone philosopher, "everything is connected with everything else."

The Second Circuit's recent opinion in *Hattem* has also surveyed the bounds of the "connection with" prong.  "[P]reemption is not called for 'if the state law has only a tenuous, remote, or peripheral connection with covered plans, *as is the case with many laws of general applicability*.'" *Hattem*, 449 F.3d at 429 (quoting *Travelers*; emphasis in *Hattem*).  An "indirect economic effect" is not sufficient; "rather, the law must actually dictate which choices *must* be made." *Id.* Summarizing its own precedents, the Second Circuit said in *Hattem* that:

> In determining whether a new law is preempted, we have found it helpful to examine prior laws that have *not* been preempted. . . . Generalizing from these cases, we found, in *Aetna Life,* that "laws that have been ruled preempted are those that provide an alternative cause of action to employees to collect benefits protected by ERISA, refer specifically to ERISA plans and apply solely to them, or interfere with the calculation of benefits owed to an employee." Contrarily, "[t]hose that have not been preempted are laws of general application — often traditional exercises of state power or regulatory authority — whose effect on ERISA plans is incidental."

*Hattem*, 449 F.3d at 430-31 (quoting *Aetna Life*, 869 F.2d at 146).[7]  The Second Circuit noted that "preemption is not limited to these areas," but they are, of course, instructive in guiding my analysis as to whether or not the plaintiff's claims are preempted in this case.

## 2.    The "Reference To" Prong

---

[7]     Of course, a *conflict with* an ERISA remedy almost automatically amounts to a *connection with* ERISA.  The Second Circuit said in *Hattem*:

> In *Gerosa,* we also noted that "state laws that would tend to control or supersede central ERISA functions — such as state laws affecting the determination of eligibility for benefits, amounts of benefits, or means of securing unpaid benefits — have typically been found to be preempted."

449 F.3d at 431 (quoting *Gerosa v. Savasta & Co.,* 329 F.3d 317, 324 (2d Cir. 2003)).

The "reference to" prong is the easier of the two to assess.[8]  In *Dillingham*, the Supreme

Court held that a law "has a reference to" a plan where it "acts *immediately* and *exclusively* upon

ERISA plans, . . . or where the existence of ERISA plans is *essential to the law's operation*."  519

U.S. 316, 325 (1997) (emphases added).  A law will not be preempted under the "reference to" prong

if it "functions irrespective of . . . the existence of an ERISA plan."  *Id.* at 328.

But the "reference to" prong is not always applied literally.  A statute whose plain language

mentions ERISA might or might not qualify for preemption under this prong.  *Compare Hattem*, 449

F.3d at 432 ("While singling out ERISA plans for special treatment is considered a 'reference,'

simply mentioning the word 'ERISA' is not."), *with De Buono*, 520 U.S. at 815 & n.15 (noting that

provisions which "expressly," "explicitly," or "specifically" refer to ERISA can be preempted "on

that basis alone").  On the contrary, a common law claim (that has no statutory text, and therefore

cannot make an explicit "reference to" ERISA, or much else) might still qualify for preemption

under this prong.  *See Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 140 (1990) (holding that a

common law cause of action for "wrongful discharge" "makes specific *reference to*, and indeed is

premised on, the existence of a pension plan." (emphasis added)).

### 3.    Applying Preemption to Common Law Claims

As I have already discussed, the first step in the ERISA preemption analysis is to examine

the "State law" for a "reference to" or "connection with" ERISA or its purposes.  However, this task

is more difficult when a plaintiff asserts common law claims, which have no statutory language to

dissect and examine for ERISA-relatedness.  Four of the five claims being challenged by SNET are

---

[8]    *Cf. Boggs v. Boggs*, 520 U.S. 833, 860 (1997) (Breyer, J., dissenting) (acknowledging that
"[t]he 'connection' problem is more difficult" than the reference-to prong).

common law claims.

*Ingersoll-Rand v. McClendon,* 498 U.S. 133, decided five years before Travelers, considered this question.  In that case, the plaintiff, a resdient of Texas, was fired four months before his pension would have vested.  The plaintiff sued under various tort and contract theories,[9] possibly because he could claim greater damages that way.[10]  The plaintiff could have raised a similar claim under ERISA, which also creates a private right of action for employees who are terminated by companies "for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan."  ERISA § 510, codified at 29 U.S.C. § 1140.

The Supreme Court expressed concern that permitting state actions to overlap with the federal remedy could expose multi-state employers to several different standards regarding wrongful termination, violating a central ERISA goal of protecting the planning interests of contributing employers.  *Ingersoll*, 498 U.S. at 142.  Congress intended ERISA's wrongful-termination remedy "to be the exclusive remedy for rights guaranteed under ERISA." *Id.* at 144. Otherwise, "'[t]he policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA.'" *Id.* (*quoting Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987)).  That objective presented a problem in *Ingersoll-Rand*

---

[9]     It is unclear what happened to the plaintiff's claims other than the one for wrongful discharge.

[10]     *See* 1 Ronald J. Cooke, *ERISA Practice & Procedure* § 2:16 (Supp. 2008) ("[W]ith a few exceptions, the effect of preemption is that punitive damages, which are available in tort on proper showing, are not generally available under ERISA.").

because of the elements grafted by Texas case law upon the Texas cause of action plaintiff asserted.[11]

While the overlapping state and federal remedies troubled the Court, it did not choose to make such overlap the determining factor when assessing preemption. Instead, the Court rested its holding on a bright-line requirement for preemption: "the existence of a pension plan [was] a critical element of [the] state-law cause of action." *De Buono*, 520 U.S. at 815 & n.14.[12] Such a requirement *necessarily* made "reference to" an ERISA pension plan.[13]

Some courts have been tempted to interpret *Ingersoll* as standing for the proposition that any state cause of action offering relief that would overlap with relief already provided by ERISA must therefore be preempted. But that, the Second Circuit has said, would be reading ERISA preemption too broadly:

> In our view *Ingersoll* represents not a categorical rule barring state causes of action that might overlap with ERISA, but rather an application of the general principle that preemption depends on

---

[11]      The *Ingersoll-Rand* Court observed that:

> The Texas cause of action *makes specific reference to*, and indeed is premised on, the existence of a pension plan. In the words of the Texas court, the cause of action "allows recovery when the plaintiff proves that the principal reason for his termination was the employer's desire to avoid contributing to or paying benefits under the employee's pension fund." Thus, *in order to prevail, a plaintiff must plead, and the court must find, that an ERISA plan exists and the employer had a pension-defeating motive in terminating the employment.* Because the court's inquiry must be directed to the plan, this judicially created cause of action "relate[s] to" an ERISA plan.

498 U.S. at 140 (emphases added).

[12]      *See also Ingersoll-Rand*, 498 U.S. at 139-40 ("We are not dealing here with a generally applicable statute that makes no reference to, or indeed functions irrespective of, the existence of an ERISA plan. . . . Here, the existence of a pension plan is a critical factor in establishing liability under the State's wrongful discharge law.").

[13]      *See* footnote 11, *supra*.

whether state remedies are consistent with ERISA's core purposes. .
. . *[W]here there is no comparable statutory objective that would be
served by preemption, the ERISA text is open to the possibility that
alternate state remedies might be available.* Therefore, the extent to
which ERISA's remedial provisions preempt state law is not
necessarily absolute; as with any provision, preemption must be
considered in light of Congress's purposes in enacting the statute.

*Gerosa v. Savasta & Co.*, 329 F.3d 317, 325 (2d Cir. 2003) (emphasis added).

The Supreme Court also distinguished *Ingersoll-Rand* in its later opinion in *Rush Prudential
HMO, Inc. v. Moran*, 536 U.S. 355 (2002).  In that case, the Court held that an Illinois statute
providing for independent review of disputes between HMOs and primary-care physicians was not
preempted, even though ERISA, too, offered a remedy for complaining beneficiaries.  Analyzing that
distinction, the Second Circuit wrote that

*Ingersoll*'s apparent presumption against additional, non-ERISA
remedies did not apply where the result of the alternative state
enforcement scheme constituted no more than 'indirect economic
effects" on the administration of a plan.   That is, *while some
alternative remedies interfere with central ERISA purposes, and are
therefore preempted, others do not, and therefore are not.*

*Gerosa*, 329 F.3d at 326 (citations omitted; emphasis added).

Furthermore, the historical status of common law claims as within the realm of state power
tends to weigh against preemption.  For example, it is beyond question that claims for personal injury
based in the common law are an area of "traditional state regulation," and are within the state's
historic police powers.  Judge Calabresi began a recent Second Circuit opinion regarding preemption
with precisely that point:

It has long fallen within the province of states to safeguard the health
and safety of their citizens.  Consonant with the historic primacy of
state regulation of these matters, the power of states to govern in this
field is considerable and undisputed.  Historically, *common law
liability has formed the bedrock of state regulation*, and common law

-13-

> tort claims have been described as a critical component of the States'
> traditional ability to protect the health and safety of their citizens.

*Desiano v. Warner-Lambert & Co.*, 467 F.3d 85, 86 (2d Cir. 2006) (emphasis added; internal quotation marks and citations omitted); *see also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 894 (2000) (Stevens, J., dissenting) ("[S]tate laws . . . such as the provision of tort remedies to compensate for personal injuries . . . are within the scope of the States' historic police powers . . . .").

A tort claim that directly interferes with administration of an ERISA plan may yet be preempted.[14] Nevertheless, the presumption against preemption has teeth.  In *Geller v. County Line Auto Sales, Inc.*, the Second Circuit held that an ERISA plan may provide contextual background for a "garden variety fraud" without triggering preemption where the fraud claim "does not rely on the [ERISA] plan's operation or management."  86 F.3d 18, 22-23 (2d Cir. 1996).  "Allowing the plaintiffs to pursue their common law . . . claim[s] would in no way compromise" ERISA's purpose: "to protect the interests of participants and beneficiaries of employee benefit plans." *Id.* (citing *Ingersoll-Rand*, 498 U.S. at 137).  And similarly, in *Gerosa v. Savasta & Co.*, the Second Circuit held that ERISA did not preempt state tort claims based on negligent failure to follow professional standards.  329 F.3d at 329-30 ("[I]mmunizing actuaries could harm the financial integrity of the plans Congress intended to protect. . . . We find it implausible that Congress intended such results.").

---

[14]     For example, "'ERISA preempts state common law claims of fraudulent or negligent misrepresentation when the false representations concern the existence or extent of benefits under an employee benefit plan.'" *Cicio v. Does 1-8*, 321 F.3d 83, 96 (2d Cir. 2003) (quoting *Griggs v. E.I. DuPont de Nemours & Co.*, 237 F.3d 371, 378 (4th Cir. 2001)), *vacated sub nom. Vytra Healthcare v. Cicio*, 542 U.S. 933 (2004), *aff'd in part and rev'd in part on remand*, *Cicio v. Does 1-8*, 385 F.3d 156, 158 (2d Cir. 2004) (*per curiam*); *see also DaPonte v. Manfredi Motors, Inc.*, No. 04-5495, 157 Fed. Appx. 328, 330 (2d Cir. Sept. 15, 2005).

III.     **Discussion and Application**

A.     **The Test for Preemption in the Second Circuit**

The several precedents discussed thus far do not lend themselves to an easy test for ERISA preemption. But studying them together, a multi-factor test emerges for ERISA preemption may be derived from the Supreme court and Second Circuit cases.

Both the Supreme Court and the Second Circuit instruct district courts to be guided by two principles of preemption. First, "[p]reemption is fundamentally a question of congressional intent." *Gerosa*, 329 F.3d at 323. Second, areas of law that are historically within the state's police power are not preempted unless it was the "clear and manifest purpose" of Congress to do so, *id.* at 327; those who seek preemption of such laws face a "heavy burden." *Hattem*, 429 F.3d at 431.

*Hattem* then directs me to assess the state law for a "reference to" ERISA or for a "connection with" ERISA. These two prongs, originally from *Shaw*, have been supplemented with a variety of factors by the Second Circuit.

First, when looking for a "reference to" ERISA, I must ask: (1) Does the state law act immediately and exclusively upon ERISA plans? *See Dillingham*, 519 U.S. at 325. (2) Does the state law require an ERISA plan as a critical element of a cause of action? Or can the state law function irrespective of the existence of ERISA plans? *See id.*; *Hattem*, 449 F.3d at 432-35.

Next, when searching for a "connection with" ERISA, I must ask: (1) Does the state law single out ERISA plans, entities, or actors, or is it a law of general applicability? (2) Does the state law force ERISA plans or actors to make a specific choice, or act in a certain manner, either directly or indirectly through irresistible economic incentives? (3) Does the state law impose significant administrative burdens or acute economic effects on ERISA plans or actors? (Is there a risk of

-15-

inconsistent laws in other states?) And finally, (4) does the state law conflict with a remedy that is already exclusively provided by ERISA — such as for determining eligibility for benefits, or the amount of such benefits — in a way that frustrates congressional intent? *See Hattem*, 449 F.3d at 431-32.

### B.  Collins's Claims

Plaintiff's claims all incorporate the following allegations in his Complaint:

> 14.    On or about November 30, 2005 Southern New England Telephone Company merged with AT&T.

> 15.    As part of that merger, the Respondent employees were provided with a thirty (30) day letter and offered the option to resign with severance based on years of service with the Defendant.

> 16.    The Plaintiff was the only employee who was refused the option to resign with severance.

> . . .

> 19.    The Plaintiff notified Defendant that he was not qualified for the [new position he was assigned] and requested the offered severance.

Second Am. Compl. [doc. #16] at 3-4.

Defendant's entire Motion To Dismiss is premised on the argument that "[t]he benefits . . . at issue undisputedly are part of an ERISA-governed plan," and "[e]ach count . . . thus relies on a claim that plaintiff was denied severance benefits." Def.'s Mem. [doc. #18] at 7.  SNET argues:

> Plaintiff's action is therefore at its core based upon a claim that SNET unlawfully refused him the opportunity to resign from the company and collect severance under an ERISA-qualified plan.  Similar to the claim before the United States Supreme Court in *Ingersoll-Rand Co. v. McClendon*, the existence of an ERISA-governed plan is thus a "critical factor in establishing liability" in plaintiff's action against SNET.  Indeed, this Court cannot determine whether plaintiff was

-16-

> eligible to receive severance benefits (and therefore cannot decide the ultimate issue in this case, specifically whether SNET wrongfully denied plaintiff severance) without referring to the plan.

*Id.* But Collins has not argued or alleged that he *was entitled* to severance benefits, nor has he raised any claims directly under ERISA. And for its part, SNET has not alleged that its failure to provide Collins with the resignation-with-severance option was in any way a "determination of benefits" that might be protected by ERISA.

Instead, Collins has alleged five counts in his Complaint under state law — one statutory count, for race discrimination, and four common law claims. I describe these claims in turn.

### 1.     Count Two: State Law Claims for Race Discrimination

Connecticut General Statute § 46a-60(a)(1) makes it illegal for an employer to "discriminate against [an] individual in compensation or in terms, conditions or privileges of employment because of the individual's race . . . ." Presuming all factual allegations in the Complaint to be true, and drawing all reasonable inferences therefrom, Collins states that "[a]ll other Caucasian employees were provided with the . . . [o]ption to resign with full severance package . . . ." Compl. ¶¶ 30, 36. He also states that he was "[d]iscriminated against when . . . placed into a position that he was not qualified to perform" and "[d]iscriminated against when . . . denied training as promised." *Id.* ¶¶ 31, 37.

On its face, the only reference Count Two makes to the ERISA-governed plan is that Collins was not offered "the option to accept full severance," when all of his similarly situated colleagues were. *Id.* ¶ 37. Collins does not even reference the value of that severance when alleging the damages he suffered: "As a result of the foregoing conduct, the Plaintiff suffered and will continue

to incur damages, including but not limited to, emotional and psychological stress, distress, anxiety, and loss of the ability to enjoy life's pleasures and activities." *Id.* ¶ 40.[15]

## 2.    Count Three: Intentional Infliction of Emotional Distress

Collins's next count sounds in tort, and none of the elements of this tort refers to an ERISA plan, either explicitly or implicitly.[16]  The Complaint appears to allege the basic elements of this tort — such as that "Defendant knew or should have known that its actions would cause the Plaintiff severe emotional distress," *id.* ¶ 49 — but the ERISA-governed plan barely makes an appearance in this count (other than in the paragraphs incorporated by reference, already quoted above).  The only mention is that "Plaintiff was subjected to disparity wherein he was the only employee denied the opportunity to 'self-nominate' himself into another position and/or accept the Defendant's offered severance package." *Id.* ¶ 43.

Like its predecessors, Count Three also makes no mention of the ERISA plan in the damages that Collins is alleged to have suffered.

---

[15]    This is also the only measure of damages cited in Count One, for violation of Title VII.  *See* Compl. ¶ 34.

[16]    The essential elements of pleading an action for intentional infliction of emotional distress under Connecticut law are:

> 1. The actor intended to inflict emotional distress, or he knew or should have known that emotional distress was a likely result of his or her conduct;
>
> 2. The conduct was extreme and outrageous;
>
> 3. The defendant's conduct was the cause of the plaintiff's distress;
>
> 4. The emotional distress sustained by the plaintiff was severe.

16 Thomas B. Merritt, *Connecticut Practice Series: Elements of an Action* § 12:1 (Supp. 2008) (citing *Petyan v. Ellis*, 200 Conn. 243, 510 A.2d 1337 (1986)).

### 3.    Count Four: Breach of Contract

A common law claim for breach of contract clearly does not require, as one of its elements, an employee welfare benefit or retirement plan that might be governed by ERISA.[17]  And in Count Four, only the following two paragraphs mention the ERISA-governed severance plan:

> 57.    The Defendant instead of reassigning the Plaintiff into a position that he was qualified for advised the Plaintiff that if he did not accept the position he must resign without severance.
>
> . . .
>
> 59.    As a result of Defendant's unlawful conduct, Plaintiff has incurred substantial lost wages, fringe benefits and health insurance.

Even assuming that the "fringe benefits" refer to the severance that would have been paid under the plan, this count also goes on to allege all the other damages alleged in previous counts, including mental injuries and a "loss of ability to enjoy life's pleasures and activities." *Id.* ¶ 60-61.

---

[17]    That is not to say this count necessarily meets the relevant standard under Rule 12(b)(6). It goes without saying that an action for breach of contract requires the existence of a valid contract, and the Complaint fails to allege the existence of any particular contract, or to identify what particular relationship or set of promises the contract might contain that might have been breached. Instead, the Complaint makes vague references to the terms of his employment and the "Reassignment Letter." In his brief in opposition to the instant motion, Collins suggests at one point that the contract at issue in this claim is his "employment contract", [doc. #25-2] at 4, but at another point he suggests that the "Reassignment Letter" forms the basis for this claim. *Id.* at 6.  To add to the confusion, Count Five alleges that "Defendant by its words, conduct or actions formed a contract with Plaintiff," suggesting that the contract to which this count might be simply an *implied* contract of employment, whose promises would be difficult to identify.  Nevertheless, SNET's motion argues exclusively for ERISA preemption, and does not raise insufficiency of pleading as a grounds for dismissal.  Therefore, I leave the potential insufficiency of Collins's allegations for a later stage in this litigation.

And of course, the last remaining possibility — unspoken by Collins but suggested by SNET — is that the contract that was allegedly breached was the severance plan itself, which is indisputably governed by ERISA.  If that is Collins's claim, then the argument for preemption is much stronger.  But I do not reach that question on the present record.

### 4. Count Five: Breach of the Implied Covenant of Good Faith and Fair Dealing

Under Connecticut law, a claim for breach of the implied covenant of good faith and fair dealing sounds in contract, and not in tort.  *See Bellemare v. Wachovia Mortgage Corp.*, 894 A.2d 335, 346, 94 Conn. App. 593 (2006), *aff'd on other grounds*, 931 A.2d 916, 284 Conn. 193 (2007) (the Connecticut Supreme Court denied certiorari on the claim for breach of the implied covenant of good faith and fair dealing).  Again, while that claim requires a valid contract as one of its elements, it certainly does not require the existence of an employee welfare benefit or retirement plan.[18]

Also like the preceding counts, this count makes no reference to the ERISA plan, except in claiming a loss of unspecified "fringe benefits" among other kinds of damages.  Compl. ¶ 69.

### 5. Count Six: Promissory Estoppel

Finally, a common law claim of promissory estoppel sounds in contract.  *See Stewart v. Cendant Mobility Servs. Corp.*, 267 Conn. 96, 104, 837 A.2d 736, 742 (2003) ("This court has recognized, however, the development of liability in contract for action induced by reliance upon a promise, despite the absence of common-law consideration normally required to bind a promisor." (citation omitted)).  As such, however, a claim for promissory estoppel works in the alternative to a claim for breach of contract.  *See generally Glazer v. Dress Barn, Inc.*, 274 Conn. 33, 88-89, 873 A.2d 929, 963-64 (2005).

---

[18]     Plaintiffs in Connecticut may assert a lack of good faith and fair dealing in performance of an implied contract of employment.  *See generally Jones v. H.N.S. Management Co.*, 883 A.2d 831, 834-35, 92 Conn. App. 223, 227 (2005).

And like all of the preceding counts, it also does not require a plaintiff to plead an employee welfare benefit or retirement plan as one of its elements.  *See* Restatement (Second) of Contracts § 90 (1981).  This count makes no reference to the severance plan at all, either in its factual allegations or in its claim for damages.

### C.    Applying the Test for Preemption

I begin by noting that virtually all of the claims asserted here by Collins are historically within the state's police power.  Actions in tort and contract are the bedrock upon which the common law is built, and thus SNET faces a heavy burden in seeking to preempt those actions.  The same cannot be said for Connecticut's statute prohibiting racial discrimination, however, and therefore I will not apply the same presumption against preemption there.

Moving to the first prong of the test for preemption, I must examine whether the claims asserted by Collins have a "connection with" ERISA or an ERISA plan.

Specifically, I note that all of the claims raised by Collins arise under laws of general applicability — none of those laws singles out ERISA plans, entities, or actors.  Even as the claims are specifically raised by Collins, none singles out the severance plan as the source of any of the defendant's legal duties, or as a sole measure of damages.  The contract at issue is not the severance plan, and neither the alleged deficiency of good faith and fair dealing, nor the alleged broken promises in the estoppel count, concerns the ERISA plan.[19]  None of the laws invoked by Collins force ERISA plans or actors to act in a certain manner in every context, nor do they present ERISA

---

[19]     While the point arises in another context, the Second Circuit's observation in *Gerosa* is nevertheless apt:  "ERISA does not create a 'fully insulated legal world' for plans; they must deal with outsiders . . . under the same diverse hodge-podge of state law as any other economic actor." 329 F.3d at 328 (citation omitted).

plans or actors with specific economic incentives, nor has SNET argued as much.  I can discern no

administrative burdens or economic effects on ERISA plans or actors, and SNET has not argued any.

There has been no allegation by SNET that the state laws at issue here are in any way inconsistent

or applied differently in any other state, and I doubt that any differences are significant.  And finally,

there is no allegation by SNET that these state laws conflict with the federal remedy already

exclusively provided by ERISA, particularly the remedies established therein for determining

eligibility for benefits, or the amount of such benefits.

Indeed, of all the congressional objectives underlying ERISA preemption, described carefully

by the Second Circuit in *Hattem*, the defendant has not identified any particular objective that would

suffer any significant affect if the Court allowed the plaintiff's claims to proceed.

The second prong of my preemption analysis is to ask whether the the counts asserted by

Collins make a "reference to" an ERISA plan.  In the abstract, at least, all of the laws being

challenged in this case — laws regarding race discrimination, intentional infliction of emotional

distress, breach of contract, breach of the implied covenant of good faith and fair dealing, and

promissory estoppel — could function "irrespective of[] the existence of an ERISA plan." *Ingersoll-

Rand*, 428 U.S. at 139.  They do not refer to the plan, either by acting immediately or exclusively on

the plan, or by relying on the existence of the plan for the existence of a claim.

Thus, I conclude that ERISA does not preempt any of Collins's claims in this case.  And

while the "avalanche" of case law is sometimes contradictory, there is ample precedent in the district

courts of the Second Circuit to support this outcome.  *See, e.g.*, *Skaggs v. Subway Real Estate Corp.*,

No. 3:03-cv-1412, 2006 WL 1042337, *5 (D. Conn. Apr. 19, 2006) (Burns, J.) ("[P]laintiff claims

damages other than the loss of benefits under the health plan, including 'loss of employment, lost

compensation, fringe benefits, and other rights, privileges, and conditions of her employment, an interruption of her career, pain and suffering, loss of enjoyment of life, and extreme emotional distress.' While the employee benefit plan is a very important part of this case, the interference [with advantageous business relations] claim could survive in the absence of such a benefit plan and, therefore, that claim is not preempted by ERISA." (citation omitted)); *Denniston v. Taylor*, No. 98-Civ-3579 (LTS), 2004 WL 226147, *6, 2004 U.S. Dist. LEXIS 1512 (S.D.N.Y. Feb. 4, 2004) (Swain, J.) ("[Plaintiff] seeks to recover cash damages from the employer(s), not benefits payable through the plans. . . . At least to the extent of his damages claims that are not dependent on plan formulae for measurement, the contract claim has no 'connection with or reference to' an employee benefit plan and thus is not preempted.").

In its argument for preemption, SNET relies on *Zito v. SBC Pension Benefit Plan*. In that case, Judge Arterton dismissed a count for breach of the implied contractual duty of good faith and fair dealing because it was "simply an alternative theory to hold defendants SNET and SBC liable for the benefits under the ERISA plan, and is therefore preempted," and because the count "plainly relates to the denial of benefits." *Zito*, No. 3:02-cv-277 (JBA), 2002 U.S. Dist. LEXIS 17616, *5-6 & n.2, 2002 WL 31060363 (D. Conn. July 18, 2002).

Here, Collins has raised no claims under the ERISA plan and he barely mentions the plan in describing his damages. Thus, his common law claims clearly are not an "alternative theory" to hold his employer liable. His state discrimination claim "relates to" the ERISA plan, but only in a tenuous way, since SNET's alleged discriminatory behavior involved depriving Collins of severance

pay as part of a larger pattern of mistreatment.[20]  Holding such a claim preempted would effectively reward employers who, as part of a larger discriminatory pattern, *also* discriminated against an employee with respect to an ERISA plan.  I doubt that Congress intended for ERISA to insulate employers from liability for such behavior.

SNET also cites *Pelosi v. Schwab Capital Markets, L.P.* for the proposition that a common law tort claim "related to" an ERISA plan would be preempted by ERISA.  462 F. Supp. 2d 503 (S.D.N.Y. 2006), In *Pelosi*, the plaintiff faced a situation somewhat similar to Collins.  Pelosi's employer was taken over by another company, and some employees were given an option to resign with severance, but Pelosi was not.

> Under the [ERISA] Plan, if as a result of the sale of [his employer], Pelosi suffered a "Job Elimination," he would be entitled to severance benefits.  As alleged by Pelosi, as a result of the sale he would fall within the definition of "Job Elimination" unless he was offered comparable employment by UBS [the purchaser].  UBS did in fact offer him a post-closing position . . . .  Pelosi alleges this post-transaction position was in no way comparable to his [old] position. . . .
>
> Pelosi alleges that in order to avoid paying his substantial severance, [the defendants] conspired to offer him what was clearly a non-comparable position. Further, other similarly situated . . . employees were given informal "soft" offers from [the purchaser] and in the event those "soft" offers were rejected, [the purchaser] refrained from making formal offers. As a result, the other allegedly preferentially treated employees were given full severance under the Plan while Pelosi was denied any such benefits.

---

[20]     Clearly, there must be some point at which a "relation to" an ERISA plan — even if it is direct — becomes so tenuous that it cannot support preemption.  Consider, for a moment, the following clause in a hypothetical employment contract:  "ACME Corp. agrees to pay Mr. Jones an annual salary of: five-thousand dollars multiplied by the number of pages in the Company's current Severance Pay Plan."  The plan, which is governed by ERISA, is twelve pages long, so Mr. Jones would have an annual salary of $60,000.  Nobody would argue that any contract claims by Mr. Jones against ACME Corp. would be preempted by ERISA.

462 F. Supp. 2d at 508.

Pelosi asserted at least four claims that were challenged on a motion to dismiss. Two counts arose under ERISA: for recovery of benefits under § 502(a)(1)(B), and for discrimination under § 510. Pelosi's other two counts were for breach of fiduciary duty and for tortious interference with prospective economic advantage.

In defending his tortious interference with contract claim, Pelosi argued against preemption "because the claim does not relate to ERISA benefits, but [instead] to Pelosi's employment contract." Judge Marrero rejected this argument, finding that "the practical operation of Pelosi's tortious interference claim clearly 'relates to' the Plan. . . . The only actual consequence of the alleged interference, and the only injury Pelosi alleges *anywhere in the amended complaint*, is that the conspiracy . . . deprived him of severance benefits. Thus, but for his right to severance under the ERISA governed Plan, Pelosi would not have a claim for tortious interference." 462 F. Supp. 2d at 516 (emphasis added).

*Pelosi* is inapposite, therefore, because Collins has alleged far more than the mere deprivation of ERISA-governed benefits. He has alleged emotional distress, lost wages, and other damages. But more importantly, the gravamen of all his claims concerns his *treatment* by defendant, both relative to his similarly situated colleagues, and after accepting a new position for which he believes he was not qualified. Thus, there are crucial differences between the discrimination claims argued by Pelosi and Collins. Pelosi argued that his disparate treatment stemmed purely from his new employer's motive to avoid paying his severance. Collins alleges that his disparate treatments stemmed from race discrimination.

As for Collins's other common law claims, I conclude that the Circuit's precedents prefer the logic of a case like *Denniston* over that of a case like *Pelosi*. When the only ways in which a claim "relates to" an ERISA-governed plan is in the determination of the amount of damages, those factors should not be fatal to a claim.[21]

There is another reason why SNET's severance plan is non-essential to plaintiff's claims. Because severance plans are "employee welfare benefit plans" under ERISA, *see* 29 U.S.C. § 1002(1), "the employer has no continuing obligation to provide severance benefits; under ERISA, the employer has the right at any time to amend or terminate a severance pay plan." *Reichelt v. Emhart Corp.*, 921 F.2d 425, 430 (2d Cir. 1990). Thus, AT&T could have eliminated its entire severance plan prior to the sale to SNET, and instead offered all its employees (except Collins) an option of leaving the company with a nice toaster. In such a scenario, Collins could have raised all of the state-law claims that he raises in this lawsuit, except that instead of alleging the denial of severance benefits as an overt discriminatory act, he would have alleged the denial of a toaster. The fact that SNET chose to keep the severance plan (but trigger its provisions only for certain employees) does not insulate SNET from judicial examination of *which* employees got the parting gift.

## IV.    Conclusion

For the foregoing reasons, SNET's Motion To Dismiss is **DENIED** in its entirety. SNET is directed to file its responsive pleading within twenty (20) days of the filing of this opinion.

---

[21]    Also, I am not troubled by the possibility that this Court might someday be forced to determine what Collins's benefits would have been under the ERISA-governed plan, as part of a larger calculation of damages. Such calculations are a routine matter in claims for improperly withheld ERISA benefits under § 502(a).

It is SO ORDERED.

Dated: New Haven, Connecticut
       May 20, 2009

                                    ____/s/ Charles S. Haight, Jr._____
                                    Charles S. Haight, Jr.
                                    Senior United States District Judge